## STATE OF CONNECTICUT *v.* BRYANT BROWNE
## (AC 23041)

Dranginis, Flynn and Hennessy, Js.

Argued February 10—officially released August 10, 2004

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, was *Timothy J. Liston*, state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Bryant Browne, appeals from the judgment convicting him of numerous crimes, rendered after a jury trial.[1] The defendant's con-

---

[1] The defendant was charged in five informations with numerous criminal and motor vehicle violations, which were consolidated for trial. The jury found him guilty of larceny in the third degree in violation of General Statutes §§ 53a-124 (a) (2) and 53a-119, attempt to commit larceny in the third degree in violation of General Statutes §§ 53a-49 (a), 53a-124 (a) (2) and 53a-119, conspiracy to commit burglary in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-103, conspiracy to commit larceny in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-124, disregarding an officer's signal by engaging an officer in a pursuit resulting in death in violation of General Statutes § 14-223 (b), interfering with an officer in violation of General Statutes § 53a-167a (a), attempt to commit assault of a peace officer in violation of General Statutes §§ 53a-49 (a) (2) and 53a-167c (a) (1), criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1), misconduct with a motor vehicle in violation of General Statutes § 53a-57, reckless driving in violation of General

viction encompasses criminal activity that began with a burglary in Middletown, led to a forty-six mile police pursuit that resulted in the death of a police officer and ended when the motor vehicle the defendant was driving struck a Jersey barrier on Interstate 95 in Branford. On appeal, the defendant claims that (1) there was insufficient evidence that he caused the death of the officer or that he did so with criminal negligence, (2) the court improperly charged the jury with respect to intervening cause, (3) the conviction and consecutive sentences for misconduct with a motor vehicle and engaging a police officer in pursuit resulting in death violate the constitutional prohibition against double jeopardy, (4) the conviction and consecutive sentences for two counts of disregarding a police officer's signal during one continuous pursuit violate the constitutional prohibition against double jeopardy, (5) the information charging him with interfering with a police officer was duplicitous, (6) the conviction of larceny and attempt to commit larceny, on the basis of one act of theft, violated the constitutional prohibition against double jeopardy and (7) he is entitled to a judgment of acquittal as to the conviction of larceny in the third degree and attempt to commit larceny in the third degree. We affirm the judgment of the trial court.[2]

The jury reasonably could have found the following facts in reaching its verdict. On January 28, 2000, the

Statutes § 14-222 and engaging an officer in pursuit in violation of General Statutes § 14-223 (b).

The defendant's total effective sentence was thirty-two years in the custody of the commissioner of correction.

[2] The jury found the defendant not guilty of burglary in the first degree, conspiracy to commit burglary in the first degree, felony murder, manslaughter in the first degree, criminal mischief in the first degree and two counts of attempt to commit assault in the first degree. The jury was unable to reach a verdict on the charges of attempt to commit assault of a peace officer and reckless endangerment in the first degree, and the court declared a mistrial as to those counts.

defendant was an unemployed drug addict with a $40 a day heroin habit. That morning, he met his accomplice, Victor Santiago,[3] in New Haven and drove to Middletown. At approximately 11:30 a.m., the pair forcibly entered the unoccupied home of the Fraulino family. They ransacked the house, collecting jewelry, cash and electronic equipment. Shortly thereafter, Rosemary Fraulino returned home and observed an unfamiliar motor vehicle in the driveway. She did not stop at her house but instead called the police on her cellular telephone to alert them to the suspicious occurrence.

John Labbadia, a Middletown police officer, responded to the scene and partially blocked the defendant's vehicle in the driveway. The defendant and Santiago saw Labbadia arrive. When the officer walked to the rear of the house, they abandoned some of the Fraulinos' possessions in the living room and foyer. The defendant got into his vehicle and sped away with his accomplice.

Labbadia, believing that he had interrupted a burglary, radioed the police dispatcher. He pursued the defendant and Santiago on back roads and side streets to Route 9. George Dingwall, a sergeant on the Middletown police force, heard Labbadia's broadcast and joined the pursuit. A Portland police officer also heard Labbadia's broadcast. Three police cruisers with lights and sirens activated followed the defendant's vehicle south on Route 9 at a high rate of speed.

The state police had been alerted, and a number of troopers positioned themselves at exit six on Route 9. One trooper placed stop sticks[4] across a lane of the

---

[3] Santiago was tried separately.

[4] Stop sticks are hollow spikes attached to a rollout strip that police officers can throw across a highway to stop fleeing vehicles. When a tire passes over a stop stick, the stop stick punctures the tire and causes it to deflate slowly.

highway, but the defendant successfully avoided them. Several troopers then joined the chase. The defendant operated his vehicle in an erratic manner back and forth across the highway.

Near exit four in Essex, Dingwall drove his cruiser beside the defendant's vehicle. The defendant swerved his vehicle toward Dingwall's vehicle. Dingwall lost control of his cruiser, which spun around and off the highway, crashing in a heavily wooded portion of the median.

The defendant continued to drive south on Route 9 at a high rate of speed. Scott Wisner, a state trooper, positioned his cruiser alongside the defendant's vehicle. The defendant swerved toward Wisner's cruiser, striking it. Wisner dropped back, and Labbadia moved his cruiser ahead of the defendant's vehicle. The defendant's car struck the rear of Labbadia's cruiser, which also spun out of control and off the highway. The defendant then drove onto Interstate 95 southbound.

The state police responded in force. One trooper preceded the pursuit and warned motorists to move off the highway. State troopers used their cruisers to block the entrance ramps to the interstate highway. At exit sixty-seven, the state troopers deployed stop sticks again, but the defendant veered off the roadway to avoid them. At exit sixty-three in Clinton, police cruisers were parked in the gore between the exit and entrance ramps to the highway. State troopers were standing in the gore in another effort to deploy stop sticks. The defendant saw the trap and drove off the highway through the gore, coming dangerously close to the troopers standing there. He drove onto the entrance ramp and back onto the highway.

The defendant continued to weave through traffic. Between exits fifty-nine and fifty-eight in Guilford, Adam Brown, a state trooper, successfully deployed

stop sticks under the tires of the defendant's vehicle. Nevertheless, the defendant kept going and at exit fifty-seven attempted to force Robert Hart, a state trooper, off the highway. The defendant stopped his vehicle, which was traveling on the rims of its wheels, against the Jersey barriers near exit fifty-four in Branford.

When the defendant got out of his vehicle, he said, "I'm on drugs, man—real bad—I'm on drugs." Personalty belonging to the Fraulino family was found in the defendant's vehicle. As a state trooper was transporting the defendant to the state police barracks in Westbrook, a police radio dispatch broadcasted information that Dingwall had been transported to a hospital by Life Star helicopter. In response, the defendant made several unsolicited remarks: "It's not my fault; I'm on drugs; you can't blame me for any of this because I'm on drugs." Dingwall died as a result of his injuries.

I

The defendant's first claim concerns his conviction of misconduct with a motor vehicle[5] and disregarding an officer's signal by engaging an officer in pursuit causing death.[6] He claims that the state failed to produce sufficient evidence that he caused Dingwall's death or that he did so with criminal negligence. We disagree.

[5] General Statutes § 53a-57 (a) provides in relevant part: "A person is guilty of misconduct with a motor vehicle when, with *criminal negligence in the operation of a motor vehicle*, he causes the death of another person." (Emphasis added.)

[6] General Statutes § 14-223 (b) provides in relevant part: "No person operating a motor vehicle, when signalled to stop by an officer in a police vehicle using an audible signal device or flashing or revolving lights, shall increase the speed of the motor vehicle in an attempt to escape or elude such police officer. Any person who violates this subsection shall be guilty of a class A misdemeanor, except that, if such violation causes the death or serious physical injury, as defined in section 53a-3, of another person, such person shall be guilty of a class D felony . . . ."

The following additional facts are relevant to our review of the defendant's claim.[7] The police pursued the defendant on Route 9 often at speeds in excess of 100 miles per hour. Labbadia and Dingwall attempted to box in the defendant's vehicle. After Labbadia passed the defendant's vehicle with his cruiser, he positioned his cruiser in front of the defendant's vehicle and slowed. Dingwall drove his cruiser alongside the defendant's vehicle, but the defendant swerved his vehicle into Dingwall's travel lane. Dingwall avoided a collision but lost control of his cruiser, which spun counterclockwise off the highway and collided with trees on the median strip.

The cause of Dingwall's accident was investigated. Jae Fontanella, an accident reconstruction expert for the state police, examined the site of Dingwall's accident and his police cruiser. He discovered that the right rear tire was a Goodyear snow tire and that the other tires were Goodyear all season tires. Twenty-four days before Dingwall's accident, a snow tire was used to replace a flat all season tire. Prior to the accident, Goodyear had issued a product service bulletin warning that its snow tires should not be matched with other types of tires. Fontanella also discovered that the left front tire of the cruiser was overinflated.

At the accident scene, Fontanella found several yaw marks made by the mismatched snow tire. Yaw marks of the other tires appeared more than 100 feet farther along the path of Dingwall's cruiser. The tire marks demonstrated that the cruiser was in an oversteer condition during a left turn, which caused the cruiser to move counterclockwise.

---

[7] Witnesses, including state troopers who were following Dingwall and Labbadia, gave varying testimony as to the positions of the vehicles and how the accident occurred. The discrepancies in the testimony of the witnesses is not relevant to our resolution of the defendant's sufficiency of the evidence claim.

Darryl Fieldman, a Goodyear product-analyst engineer, inspected Dingwall's cruiser and noted the mismatched tires. He prepared a report stating that it is important for a police cruiser operating at high speeds to be equipped with four of the same type of tires. At trial, Fieldman testified that in new condition, a snow tire and an all season tire would have differing tread depths, surface areas and somewhat different response characteristics. He noted that the snow tire here, however, had worn down to the point that its tread, surface area and response characteristics were similar to those of the three all season tires. Neither Fontanella nor Fieldman could determine the cause of Dingwall's accident. Fieldman opined that it was "possible," but "improbable" and "not likely" that the mismatched tires caused Dingwall's cruiser to spin off of the highway. There was no evidence that the mismatched tires caused Dingwall's accident.

Following the jury's verdict, the defendant filed a motion for a judgment of acquittal on the charges of misconduct with a motor vehicle and engaging an officer in pursuit causing death, arguing that the conviction on those counts was inconsistent with the verdict acquitting him of felony murder and manslaughter. On appeal, the defendant claims that the state failed to prove that his conduct was the proximate cause of Dingwall's death and, with regard to misconduct with a motor vehicle, that he operated his vehicle with criminal negligence. The defendant asks this court to review his unpreserved claims pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). This court has stated on numerous occasions that no practical reason exists to engage in *Golding* analysis of a sufficiency of the evidence claim because a defendant convicted by insufficient evidence necessarily has been deprived of a constitutional right. We thus review the claim as we would any properly preserved claim. See *State* v. *Ward*,

76 Conn. App. 779, 795 n.8, 821 A.2d 822, cert. denied, 264 Conn. 918, 826 A.2d 1160 (2003).

We apply a two part test to a claim of insufficient evidence. We must (1) construe the evidence in the light most favorable to sustaining the verdict and (2) decide whether on the facts so construed and the inferences reasonably drawn from them, the jury reasonably could have concluded that on the entire evidence the defendant was guilty beyond a reasonable doubt. "While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 617, 682 A.2d 972 (1996).

The defendant's appellate argument is that his leading the police on a high-speed chase could not have been the proximate cause of Dingwall's death because a reasonable person could not have foreseen that the cruiser had mismatched tires,[8] and the state failed to prove that the condition of the tires was not a superseding, intervening cause of the accident. At oral argument, he stated that it is foreseeable that during a police pursuit the fleeing vehicle could strike the police cruiser, the officer could maneuver the cruiser in a negligent manner or that the pursuit itself could violate police policy. In the defendant's view, any of these occurrences would

[8] The defendant argues in his brief: "[T]he question is not whether the third person acted innocently, negligently, intentionally or criminally, but whether in a significant number of cases, a third person will react in a particular way in response to the defendant's criminal or negligent conduct. If the third person's actions are a foreseeable response to the defendant's criminal conduct, then the person's conduct may not be an intervening cause. Where the third person's actions are so unusual, abnormal or extraordinary that they could not have been foreseen, then they will be an intervening cause that relieves the defendant of criminal liability."

not be a superseding, intervening act with respect to criminal behavior because they were foreseeable.

He argues, however, that mismatched tires on a police cruiser are not foreseeable and that they relieve the fleeing suspect of responsibility. The defendant's argument misperceives the basic tenet of proximate cause. It is not whether the direct cause of the injury is foreseeable, but whether the injury itself was within the scope of the risk created by the defendant's conduct.

"Proximate cause in the criminal law does not necessarily mean the last act of cause, or the act in point of time nearest to death. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the resulting death. It is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence. . . . It is unnecessary for proximate cause purposes that the particular kind of harm that results from the defendant's act be intended by him. In many situations giving rise to criminal liability, the harm that results is unintended, yet is directly or indirectly caused by an act of the defendant. In such cases, where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible." (Internal quotation marks omitted.) *State* v. *Wassil*, 233 Conn. 174, 181–82, 658 A.2d 548 (1995).

"To prove causation, the state is required to demonstrate that the defendant's conduct was a proximate

cause of the victim's death—i.e., that the defendant's conduct contributed substantially and materially, in a direct manner, to the victim's injuries and that the defendant's conduct was not superseded by an efficient intervening cause that produced the injuries." (Internal quotation marks omitted.) Id., 181. Although there was no compelling evidence that the mismatched tires contributed to Dingwall's accident, the defendant argues that because he could not foresee that the cruiser had mismatched tires, the condition of the tires was an efficient intervening cause of Dingwall's death. The defendant's argument is contrary to our law.

"The doctrine of intervening cause . . . has deep roots in the law of proximate cause, both criminal and civil . . . . It refers to a situation in which the defendant's conduct is a 'but for' cause, or a cause in fact, of the victim's injury, but nonetheless some other circumstance subsequently occurs—the source of which may be an act of the victim, the act of some other person, or some nonhuman force—that does more than supply a concurring or contributing cause of the injury, but is unforeseeable and sufficiently powerful in its effect that it serves to relieve the defendant of criminal responsibility for his conduct." (Citations omitted.) *State* v. *Munoz*, 233 Conn. 106, 124, 659 A.2d 683 (1995).

We are not persuaded by the defendant's argument distinguishing the foreseeability of a collision that results from a defective condition of a police cruiser and one that occurs when a defendant strikes a cruiser during the course of a high-speed chase. Proximate cause generally is a question of fact for the jury to determine. See *Doe* v. *Manheimer*, 212 Conn. 748, 756, 563 A.2d 699 (1989), overruled in part on other grounds, *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 608, 662 A.2d 753 (1995). Here, it was reasonable for the jury to conclude that the accident was within the scope of the risk the defendant created by leading the

police on a high-speed pursuit. As we say frequently, jurors are not expected to leave their common sense and life experience at the courthouse door. See, e.g., *State* v. *Koslik*, 80 Conn. App. 746, 756, 837 A.2d 813, cert. denied, 268 Conn. 908, 845 A.2d 413 (2004). A reasonable person could foresee that during a high speed chase, a police officer, another motorist on the highway, an innocent bystander or the defendant himself could be injured.

By the same reasoning, i.e., that he could not foresee that Dingwall's cruiser would have mismatched tires, the defendant claims that the state failed to prove that he operated his vehicle with criminal negligence and therefore failed to prove the charge of misconduct with a motor vehicle. Section 53a-57 provides that a person who operates his motor vehicle with criminal negligence that causes the death of another person is guilty of misconduct with a motor vehicle. See footnote 5. "A person acts with 'criminal negligence' with respect to a result . . . described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur . . . . The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (14).

On the basis of our review of the evidence, we conclude that the jury reasonably could have inferred from the evidence presented that the defendant acted with criminal negligence because the risk of an accident occurring during a police chase is foreseeable to a reasonable person. The defendant, therefore, was not convicted by means of insufficient evidence.

## II

The defendant's second claim is that the court improperly charged the jury. He claims in his brief that

the court should have told the jury that if it "believed the defense version of how the accident happened, then it had to find that the danger posed by the tires was, as a matter of law, an unforeseeable, substantial cause of the accident." We do not agree.[9]

The defendant's theory of the accident in which Dingwall died was that the accident was proximately caused by the mismatched tires on the police cruiser. In support of his theory, the defendant relies on the testimony of witnesses that varies somewhat from the facts set out in part I. But see footnote 7. According to the testimony of Clanford Pierce, a state trooper taking part in the pursuit behind Dingwall, the defendant did not move his vehicle from side to side. Thomas Lillis, another state trooper, testified that he was 700 feet away and saw the defendant's vehicle moving straight ahead before Dingwall's vehicle yawed and spun off the highway. Wisner saw the defendant's vehicle swerving back and forth across two lanes of travel in an erratic manner. None of these witnesses saw anything that appeared to them to be the direct cause of Dingwall's accident. On the basis of the testimony of these witnesses, the defendant argues that Dingwall did not lose control of his cruiser while trying to avoid the defendant's vehicle but lost control for no discernible reason, until the problems with the tires came to light.

The defendant does not challenge the bulk of the court's instruction on proximate and intervening causes. He takes exception to the following portion of the charge. "Here, the defendant claims that the mismatched tires on Sergeant Dingwall's vehicle and, or, the conduct of the police during the pursuit were intervening causes of Sergeant Dingwall's death. Even if you find that the tires were a cause of death or that the police were negligent or reckless during the pursuit,

---

[9] The defendant's second claim is a reconfiguration of his first claim.

the question is whether or not either or both contributed to the death or were either or both unforeseeable and sufficiently powerful in its effect that it serves to relieve the defendant of criminal responsibility for his conduct."

The defendant did not preserve his claim at trial and asks this court to reverse his conviction under the doctrine set out in *State* v. *Golding,* supra, 213 Conn. 239–40, or the plain error doctrine under Practice Book § 60-5. The record is adequate for our review, and a claim that the court improperly charged the jury on an element of a crime is one of constitutional magnitude. See *State* v. *Munoz,* supra, 233 Conn. 114. The claimed constitutional violation, however, did not clearly exist, and the challenged portion of the court's instruction is not plain error, as it does not undermine society's confidence in our judicial system.

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Betances,* 265 Conn. 493, 509–10, 828 A.2d 1248 (2003).

On the basis of our review of the court's entire charge, we conclude that it was legally correct and that it properly guided the jury to its verdict. The essence of the defendant's claim is that the court should have mar-

shaled the evidence in his favor and instructed the jury, as a matter of law, that it had to decide the case on the basis of his theory of the accident. In his brief, the defendant, however, concedes that proximate cause ordinarily is a question of fact for the jury. "The test is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's [actions]. . . . It becomes a question of law, however, when the mind of a fair and reasonable man could reach only one conclusion . . . . Such a determination requires us to decide where a line should be drawn." (Citations omitted; internal quotation marks omitted.) *Burns* v. *Gleason Plant Security, Inc.*, 10 Conn. App. 480, 485, 523 A.2d 940 (1987). Here, we draw the line on the side of a factual determination to be decided by the jury.

As we stated in part I, the jury reasonably could have concluded that the mismatched tires contributed to the accident but that a mechanical failure of any type was within the scope of the risk created by the defendant's criminal behavior of leading the police in pursuit. The court's instruction, therefore, was not a clear violation of the defendant's constitutional right and did not deprive him of a fair trial.

### III

On appeal, the defendant has raised four unpreserved claims based on his right not to be twice punished for the same offense, as guaranteed by the fifth and fourteenth amendments to the United States constitution. He claims that his right was violated by his conviction of certain crimes. Specifically, he claims that the fifth amendment's double jeopardy clause was violated by his conviction and sentencing for (1) misconduct with a motor vehicle and engaging an officer in pursuit resulting in death, (2) two charges of disregarding an officer's signal during one continuous pursuit, (3) lar-

ceny in the third degree and attempt to commit larceny in the third degree and (4) duplicitous charges of interfering with an officer. The defendant's unpreserved claims are reviewable under *Golding*.[10] See *State* v. *Chicano*, 216 Conn. 699, 705, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). The defendant, however, cannot prevail because the constitutional violations clearly did not exist and deprive him of a fair trial. See id., 704.

"Traditionally we have applied the *Blockburger* test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). This test is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Kirsch*, 263 Conn. 390, 420, 820 A.2d 236 (2003).

"The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." (Internal quotation marks omitted.) Id., 421–22. "Consistent with our well established jurisprudence on statutory construction, we begin with the language of the statute." Id., 418. "We are also mind-

---

[10] The defendant also seeks review of his second, third and fourth double jeopardy claims pursuant to the plain error doctrine. We decline to afford such review, as the claims are not of the truly extraordinary nature that plain error is intended to remedy. See *State* v. *Holmes*, 78 Conn. App. 479, 484, 827 A.2d 751, cert. denied, 266 Conn. 909, 832 A.2d 73 (2003).

ful of well established principles that govern the construction of penal statutes. Courts must avoid imposing criminal liability where the legislature has not *expressly* so intended. . . . Accordingly, [c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Harrell*, 238 Conn. 828, 832, 681 A.2d 944 (1996). The legislature bars multiple punishments expressly when it does not intend such punishment. *State* v. *Servello*, 80 Conn. App. 313, 323, 835 A.2d 102 (2003), cert. denied, 267 Conn. 914, 841 A.2d 220 (2004); see also *State* v. *Perez*, 78 Conn. App. 610, 642, 828 A.2d 626 (2003) (noting statutes in which legislature barred multiple punishments for same act or transaction).[11]

Statutory construction is a matter of law over which we exercise plenary review. *State* v. *Sanchez*, 75 Conn. App. 223, 232, 815 A.2d 242, cert. denied, 263 Conn. 914, 821 A.2d 769 (2003).

A

The defendant's first double jeopardy claim is that he was unconstitutionally convicted of misconduct with a motor vehicle and of engaging an officer in pursuit resulting in death. The essence of his claim is that only one punishment may be imposed for a single homicide that involved the violation of two separate statutory provisions. We are not persuaded.

The charges against the defendant arose out of the same act or transaction. We therefore examine the text of the statutes to determine whether they each contain

[11] See, e.g., General Statutes § 53a-102a (a), which provides in relevant part: "*No person shall be convicted* of burglary in the second degree and burglary in the second degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information." (Emphasis added.)

an element the other does not. See footnotes 5 and 6, respectively, for the full texts of §§ 53a-57 (a) and 14-223 (b). At first glance, one sees easily that the statutes contain multiple elements that are dissimilar. Section 53a-57, misconduct with a motor vehicle, requires proof of criminal negligence, which is the failure to perceive a substantial and unjustifiable risk that the result will occur. Criminal negligence is the failure to perceive that the risk constitutes a gross deviation from the standard of care that a reasonable person would observe. See General Statutes § 53a-3 (14). Section 14-223 (b) requires proof that an officer using an audible signal or flashing or revolving lights signaled the operator to stop and that the operator increased his vehicle's speed in an attempt to escape. Neither statute contains the language our legislature employs when it expressly prohibits multiple punishments for the same act. See footnote 11. The clear language of the statutes themselves is sufficient for us to conclude that they do not impose two punishments for the same act. We note that it is possible to violate § 53a-57 without failing to obey a police officer's signal to stop and that one can violate § 14-223 (b) without causing the death of another person.

The defendant argues that his claim is controlled by *State* v. *John*, 210 Conn. 652, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). In *John*, our Supreme Court held that a defendant could not be convicted of felony murder; General Statutes § 53a-54c; and manslaughter in the first degree; General Statutes § 53a-55; for the same act, and that the legislature "contemplated that the two statutory provisions should be treated as a single crime for double jeopardy purposes." *State* v. *John*, supra, 695. The court concluded that the history of felony murder and murder, in conjunction with *State* v. *Couture*, 194 Conn. 530, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S.

Ct. 967, 83 L. Ed. 2d 971 (1985),[12] "indicates that the legislature contemplated that only one punishment would be imposed for a single homicide . . . ." *State* v. *John*, supra, 696. *State* v. *Bunkley*, 202 Conn. 629, 522 A.2d 795 (1987), and other cases overcome the defendant's argument. See, e.g., *State* v. *Kirsch*, supra, 263 Conn. 420 (conviction of manslaughter in first degree; General Statutes § 53a-55 [a] [3]; and manslaughter in second degree with motor vehicle; General Statutes § 53a-56b; do not violate prohibition against double jeopardy).

Our Supreme Court addressed the development of our statutory law from the common law, particularly with respect to murder, manslaughter and the motor vehicle laws in *State* v. *Bunkley*, supra, 202 Conn. 636–42. *Bunkley* distinguishes the mens rea element in various criminal statutes with respect to the death of a person, as well as in the motor vehicle statutes. "[O]ur statutes relating to vehicular homicide are applicable if death occurs through *criminal negligence* or simply through *negligence* in the operation of a motor vehicle. See General Statutes §§ 53a-57, 14-222a." *State* v. *Bunkley*, supra, 639. The court found "wholly without merit" the argument that the legislature intended that a person causing death while operating a motor vehicle should be prosecuted only under those statutes. Id.

Here, the defendant was convicted under § 53a-57 of the Penal Code.[13] That section requires a mens rea of criminal negligence, which is defined in § 53a-3 (14) as the failure "to perceive a substantial and unjustifiable risk that such result will occur or that such circum-

---

[12] The statutes at issue in *State* v. *Couture*, supra, 194 Conn. 559, were General Statutes § 53a-54a (a), which proscribes intentional murder, and General Statutes § 53a-54c, which proscribes felony murder.

[13] General Statutes § 53a-57 (a) provides: "A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person."

stance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ." He also was convicted under § 14-223, which does not include a specific mens rea. It merely provides, in relevant part, that "[n]o person operating a motor vehicle, when signalled to stop by an officer . . . . shall increase the speed of the motor vehicle in an attempt to escape or elude such police officer . . . ." General Statutes § 14-223 (b). Section 14-223 requires only the general intent to escape or to elude a police officer signaling the operator of a motor vehicle to stop.

"General intent is the term used to define the requisite mens rea for a crime that has no stated mens rea; the term refers to whether a defendant intended deliberate, conscious or purposeful action, as opposed to causing a prohibited result through accident, mistake, carelessness, or absent-mindedness. Where a particular crime requires only a showing of general intent, the prosecution need not establish that the accused intended the precise harm or precise result which resulted from his acts." (Internal quotation marks omitted.) *State* v. *Charles*, 78 Conn. App. 125, 131, 826 A.2d 1172, cert. denied, 266 Conn. 908, 832 A.2d 73 (2003).

We also think it is significant that § 53a-57 is codified in our Penal Code, title 53a, part IV, which is titled homicide, and that § 14-223 (b) is in title 14, chapter 248 of the General Statutes, which is titled vehicle highway use. "It is a rule of statutory construction that the legislature is presumed to know all the existing statutes and that when it enacts a law it does so in view of existing relevant legislation, intending the statute enacted to be read with the pertinent existing legislation so as to make one consistent body of law." *Jennings* v. *Connecticut Light & Power Co.*, 140 Conn. 650, 665–66, 103 A.2d 535 (1954). The location of a statute in the

body of our codified law "indicates a legislative intent to deal with the matter as [e.g.] one of public utility regulation rather than zoning. Terms of the titles of legislation are indicative of legislative intent." Id., 666.

We conclude that the legislature intended two distinct punishments with respect to the statutes at issue here. Misconduct with a motor vehicle resulting in death is to be treated as a homicide, whereas leading an officer on pursuit is a violation of our motor vehicle laws.[14]

## B

The defendant's second double jeopardy claim is that he was improperly sentenced for two violations of § 14-223 (b), engaging an officer in pursuit, for one continuous transaction. The defendant claims that the state created two counts by alleging that the first violation ended and the second began when the pursuit entered Route 9. He argues that there was but one continuous course of conduct and that the misdemeanor conviction is a lesser offense included within the felony conviction. He seeks to have the misdemeanor conviction and sentence vacated.[15] We do not agree.

The claims raised in this issue arise from charges alleged in separate informations. In the first, the defendant was charged with disregarding Labbadia's signal on specific streets in Middletown, a class A misdemeanor.[16] The second information charged the defen-

___

[14] The legislature also included in title 14, motor vehicles, General Statutes § 14-222a, negligent homicide with a motor vehicle.

[15] Even if we agreed that the misdemeanor conviction was a lesser offense included within the felony conviction, the proper remedy would be to merge the conviction on the two counts and to sentence the defendant on the greater offense. See State v. Chicano, supra, 216 Conn. 723. When the conviction on the two counts is merged, neither conviction is vacated.

[16] In the fifth count of amended information MV9-407643, the prosecutor accused the defendant of "disregard of an officer's signal and charges that at the Town of Middletown, on Kelsey Street, Arbutus Street and Randolph Road, on the 28th day of January 2000, between approximately 12:05 p.m. and 12:10 p.m., the said [defendant], while operating a motor vehicle and when signaled to stop by police officers in police vehicles using an audible

dant with engaging in pursuit on Route 9 and Interstate 95, and causing Dingwall's death in Essex, a class D felony.[17] The jury found the defendant guilty of both charges. The court sentenced him to one year of incarceration on the misdemeanor conviction and to five years on the felony conviction.

On appeal, the defendant has argued that the pursuit was a continuous act, not discrete acts of conduct comprising a course of conduct. Furthermore, he argues that the statute does not define violations by the number of times a motorist refuses to respond to a signal to stop, the number of officers who signal the motorist to stop or the jurisdictions or whether the places where the motorist is signaled to stop are local or state roadways. The state argues that *State* v. *Cotton*, 77 Conn. App. 749, 825 A.2d 189, cert. denied, 265 Conn. 911, 831 A.2d 251 (2003), is controlling.[18] On the basis of our review of the facts and case law concerning double

signal device and flashing lights, did increase the speed of the motor vehicle in an attempt to elude such police officers; in violation of Section 14-223 (b) . . . ."

[17] In the second count of amended information MV9-407644, the prosecutor accused the defendant of "engaging in pursuit and charges that on Routes 9 south and [Interstate 95] south between Middletown and Branford, on the 28th day of January 2000 between approximately 12:10 p.m. and 12:40 p.m., the said [defendant], while operating a motor vehicle and when signaled to stop by police officers in police vehicles using audible signal devices, flashing and revolving lights, did increase the speed of the motor vehicle in an attempt to escape and elude such police officers and, in the Town of Essex in the vicinity of Route 9, Exit 4, such violation did cause the death of another person, namely, Sgt. George Dingwall of the Middletown Police Department; in violation of Section 12-223 (b) . . . ."

[18] In *Cotton*, the defendant was taking the victim, a disabled friend of his wife, home after dinner at the defendant's home. The defendant twice stopped his motor vehicle and made sexual advances toward the victim, the first time by use of words, the second time by physical contact. He was charged with and convicted of, among other crimes, unlawful restraint in the second degree in violation of General Statutes § 53a-96 (a) and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A). This court affirmed the defendant's conviction. *State* v. *Cotton*, supra, 77 Conn. App. 752.

jeopardy, we conclude that the facts of *State* v. *Tweedy*, 219 Conn. 489, 594 A.2d 906 (1991), are most similar to the facts and claim at issue here. See also *State* v. *Miranda*, 260 Conn. 93, 118–24, 794 A.2d 506 (conviction on two counts of assault in first degree as to sole victim in same time frame not double jeopardy), cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002).

In *Tweedy*, the defendant was convicted of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). "The convictions were based upon [two counts] of the substitute information, in which the state respectively alleged that the defendant had robbed the victim at approximately 8:30 a.m. on October 2, 1988, at [her apartment] in the City of New Haven, and then had robbed her again at approximately 9:00 a.m. on October 2, 1998 at 77 Broadway [her bank] in New Haven . . . . According to the defendant, the events at the victim's apartment and the bank were part of a continuing transaction during which he committed a single robbery. The separation of this transaction to form the basis of two robbery charges and convictions, the defendant maintains, contravenes the legislature's intent that the unit of prosecution for the crime of robbery turn upon the number of victims intimidated by a defendant's use or threatened use of force. Where, as here, a single victim is subjected to continuous intimidation by a defendant's unceasing forcible conduct, the defendant claims that the legislature intended that such a course of conduct be punished as a single robbery." (Internal quotation marks omitted.) *State* v. *Tweedy*, supra, 219 Conn. 496–97. Our Supreme Court did not agree. Id., 497.

"Double jeopardy prohibits multiple punishments for the same offense in the context of a single trial. Nonetheless, distinct repetitions of a prohibited act, however closely they may follow each other . . . may be pun-

ished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as made punishable by the [statute]." (Citations omitted; internal quotation marks omitted.) Id., 497–98.

Here, when Labbadia came upon the defendant and Santiago at the Fraulino home, the suspects got into the defendant's motor vehicle and fled the scene. Labbadia pursued them in his police cruiser with the siren activated and the lights flashing through the streets and back roads of Middletown. Had the defendant stopped at some point during this pursuit before anyone was injured, he would have been charged with the misdemeanor only. The defendant, however, drove his vehicle onto Route 9 southbound where numerous state and local police signaled that he should stop. The defendant sought to elude the police by operating his vehicle at speeds in excess of 100 miles per hour. Labbadia and Dingwall jointly attempted to box in the defendant's vehicle but he continued to take evasive action at high speeds. As a result of the defendant's conduct, Dingwall lost control of his vehicle and was killed in the ensuing collision. The defendant's conduct on Route 9, therefore, was the basis of the felony charge.

In *Tweedy*, our Supreme Court held with respect to General Statutes § 53a-133 that "[t]he legislature . . . expressly designated the course of committing a larceny, rather than the course of forcible conduct, as the time frame for completion of the offense of robbery." (Internal quotation marks omitted.) *State* v. *Tweedy*, supra, 219 Conn. 498–99. Section 14-223 (b) punishes

a motorist who fails to obey an officer's signal for him to stop and increases his speed to evade the officer. As such, a motorist is guilty of violating the statute each time he fails to obey an officer's signal to stop and increases his speed. Distinct repetitions of prohibited conduct, however closely they occur, may be punished as separate crimes without violating the prohibition against double jeopardy. The defendant's claim, therefore, is unavailing.

C

The defendant's third double jeopardy claim is that the prohibition was violated when he was convicted of larceny in the third degree and attempt to commit larceny in the third degree. The defendant claims that charging him with one count of larceny in the third degree and attempt to commit larceny in the third degree was multiplicitous, and that his claim is reviewable under *Golding*. Although the claim is reviewable under *Golding*, the claimed constitutional violation did not clearly exist or clearly deprive him of a fair trial.

In one information, the defendant was charged with violation of General Statutes §§ 53a-124 (a) (2) and 53a-119, larceny in the third degree, and, in another, with violation of General Statutes §§ 53a-49 (a) (2), 53a-124 (a) (2) and 53a-119, attempt to commit larceny in the third degree. Each of the crimes was alleged to have occurred at 320 Kelsey Street, Middletown, on January 28, 2000, at approximately noon. With respect to the larceny charge, the defendant and his accomplice were alleged to have deprived Rosemary Fraulino and Michael Fraulino of their property, namely, jewelry, cash and television remote controls, the value of which exceeded $1000. The defendant and his accomplice took this personalty with them when they fled 320 Kelsey Street. As to the charge of attempt to commit larceny, the defendant and his accomplice were alleged

to have attempted to deprive the Fraulinos of a television, camcorder, jewelry and electronic equipment, the value of which exceeded $1000. The defendant and his accomplice had moved these items to the living room and foyer of 320 Kelsey Street, intending to put them in the defendant's vehicle, when Labbadia arrived and interrupted them.

The substance of the claim is that because the total value of the Fraulinos' property that the defendant and his accomplice stole or attempted to steal was not greater than $5000, the state was unable to charge him with larceny in the second degree, a class C felony, that carries a penalty of ten years incarceration. In order to obtain a ten year sentence against him, the defendant argues, the state charged him with two class D felonies, each carrying a five year penalty. He argues that the charges were multiplicitous because the two larceny offenses arose out of the same transaction or occurrence.[19] In support of his argument, he relies on *State v. Miranda*, supra, 260 Conn. 121, for the proposition that "[t]he proper double jeopardy inquiry when a defendant is convicted of multiple violations of the same statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute." (Internal quotation marks omitted.)

"Multiplicity is defined as the charging of a single offense in several counts that leads to multiple punishments for the same offense. . . . The rule against multiplicity prohibits multiple punishments for an act which is, in law, but a single, criminal occurrence." (Citations omitted; internal quotation marks omitted.) *State v. Frazier*, 194 Conn. 233, 237, 478 A.2d 1013 (1984). "The classic test of multiplicity is whether the legislative

[19] The state concedes that the charges arose from the same transaction when the defendant broke into the Fraulino residence.

intent is to punish individual acts separately or to punish only the course of action which they constitute." *State* v. *Frazier*, 185 Conn. 211, 229–30, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982), citing *Blockburger* v. *United States*, supra, 284 U.S. 302. "The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense." (Internal quotation marks omitted.) *State* v. *Miranda*, supra, 260 Conn. 122. "The defendant on appeal bears the burden of proving that the prosecutions are for the same offense in law and fact." (Internal quotation marks omitted.) Id., 120–21.

After undertaking a *Blockburger* analysis of the crimes with which the defendant was charged, we conclude that they each contained an element that the other does not and, thus, that the legislature intended to punish separate and distinct crimes. The definition of larceny, § 53a-119, is common to both charges. A person is guilty of larceny in the third degree "when he commits larceny . . . and . . . (2) the value of the property or service exceeds one thousand dollars . . . ." General Statutes § 53a-124 (a). A person is guilty of attempt to commit larceny "if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of [larceny]." General Statutes § 53a-49 (a). The legislature also did not indicate that a person could not be convicted of one of the crimes if he were convicted of the other.

Here, the defendant successfully removed from the premises personal property belonging to the Fraulino family. The larceny was complete. Although the defen-

dant and his accomplice intended to take other, larger personalty belonging to the Fraulinos, the men were interrupted before they could complete the larceny. For these reasons, the defendant's conviction of larceny and attempt to commit larceny did not violate the constitutional prohibition against double jeopardy.

D

The defendant's fourth claim is that the information charging him with interfering with an officer was duplicitous because it alleged that he interfered with several unnamed officers of the Middletown and state police forces. He also claims that the allegedly duplicitous information resulted in the concealment of whether he was found not guilty of one of the offenses and whether the jury's conviction was unanimous as to any one of the offenses and that the allegedly duplicitous information denied him adequate notice and violated his right to be free of double jeopardy. We disagree.

The information at issue charged that "on Route 9 south and [Interstate 95] south, between Middletown and Branford, on the 28th day of January 2000 between approximately 12:10 p.m. and 12:40 p.m. [the defendant] did obstruct, resist, hinder and endanger peace officers, members of the Middletown Police Department and Connecticut State Police Department, in the performance of their duties; in violation of Section 53a-167a (a) of the Connecticut General Statutes." The defendant did not seek a bill of particulars asking the state to identify the particular officers who were the victims of his offense.[20] He did not object to the information as

[20] The defendant's claim appears to be the obverse of the continuing course of conduct argument he made with respect to his three preceding claims of double jeopardy. The defendant was charged with one count of interfering with an officer rather than interfering with each officer who participated in the pursuit and capture. "[T]he defendant is benefitted by the obvious reduction in the maximum penalties he would otherwise face if each offense had been alleged separately." *State* v. *Saraceno*, 15 Conn. App. 222, 231, 545 A.2d 1116, cert. denied, 209 Conn. 823, 824, 552 A.2d 431, 432 (1988).

duplicitous or implicating his right to a unanimous verdict, to his right to be free of double jeopardy or to a clear verdict as to his guilt. The jury returned a verdict of guilty as to the charge, and the court sentenced the defendant to one year in the custody of the commissioner of correction for the crime of interfering with an officer.

"Duplicity occurs when two or more offenses are charged in a single count of the accusatory instrument." (Internal quotation marks omitted.) *State* v. *Saraceno*, 15 Conn. App. 222, 228, 545 A.2d 1116, cert. denied, 209 Conn. 823, 824, 552 A.2d 431, 432 (1988). "It is now generally recognized that [a] single count is not duplicitous merely because it contains several allegations that could have been stated as separate offenses. . . . Rather, such a count is only duplicitous where the policy considerations underlying the doctrine are implicated. . . . These [considerations] include avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution." (Citations omitted; internal quotation marks omitted.) Id., 228–29.

In *Saraceno*, the defendant was accused of committing sexual assault on a young child on multiple occasions over a period of time. Id., 227–28. In addressing each of the policy considerations, this court concluded that because the offenses charged were exactly the same, there was no chance that the jury would return a general verdict on an entire count, obscuring a finding of not guilty. Id., 229. Given the simplicity of the evidence before the jury, it was not possible that the jury did not return a unanimous verdict. Id., 230. There was

adequate notice to the defendant because he was charged with the commission of only one crime within a specific span of time. Id., 231. Furthermore, because the defendant was charged with but a single crime, the court was not presented with a sentencing quandary. Id. Finally, because the counts of the information sufficiently delineated the time within which the defendant committed the crime, the state could not raise the same charges against him for acts occurring within that period of time. Id., 232.

We now analyze the considerations in view of the information, the court's instruction to the jury and the verdict. See id., 229. As in *Saraceno*, the defendant was charged with one crime in a single count. There was no chance, therefore, that the general verdict concealed a not guilty verdict. The court charged the jury that it had to find only that the state proved beyond a reasonable doubt all the elements of the offense as to one officer.[21] Although there is no way to know the factual

---

[21] The court charged the jury as follows on the charge of interfering with an officer. "For you to find the defendant guilty of this charge, the state must prove the following elements: One, that the defendant obstructed, resisted, hindered or endangered a peace officer; two, that the conduct of the defendant occurred while the peace officer was in the performance of his or her duties; and three, that the defendant intended to obstruct, resist, hinder or endanger a peace officer while the officers or officer were in the performance of their duties. A peace officer means a member of the division of state police within the department of public safety or an organized local police department.

"With respect to the first element, there are four words describing the ways interference may be committed. Obstruct means to interpose obstacles or impediments, to hinder, impede or in any manner intrude or prevent. This word and its definition does not necessarily imply the employment of direct force or the exercise of direct means. Resist means to oppose by direct active forcible or quasi-forcible means. Hinder means to make slower, difficult to progress. It means to hold back, to delay, impede or prevent action. Endanger means to expose to danger or harm.

"The second element is that the peace officer was in the performance of his duties. The phrase, in the performance of his duties, means that the police officers were acting within the scope of what they're employed to do as opposed to engaging in a personal frolic of their own. The officer

basis of the jury's verdict, we note that the jury reasonably could have found that the defendant committed the crime when he drove his motor vehicle through the gore at exit sixty-three of Interstate 95 where a number of officers were standing. At trial, the defendant did not challenge the good faith of those officers.

The court instructed the jury that its verdict had to be unanimous with respect to all of the elements of every crime and repeated that charge for each crime. This was not a situation in which the jury could have construed the elements of more than one crime to various factual situations. The defendant was charged with one crime, and the facts, especially with respect to his behavior at the gore, were straightforward. We also conclude that notice to the defendant was adequate; he was charged with a single offense against multiple victims that occurred at a specific time and place. If he wanted more notice, he could have requested a bill of particulars.[22]

Sentencing did not present the court with difficulty. The jury found the defendant guilty of one count of a single alleged crime. Finally, there was no risk of double jeopardy, as the count was specific as to date, time and place. For all of these reasons, we conclude that the charge of interfering with an officer was not duplicitous.

must be acting under a good faith belief that they are carrying out their duty and their actions are reasonably designed to that end.

"The third element is that the defendant not only obstructed, resisted, hindered or endangered an officer, but that he intentionally did so as opposed to any accidental or inadvertent interference. And once again, a person acts intentionally with respect to a result when his conscious objective is to cause such a result.

"If the state has proven those elements, your verdict would be guilty. If any of the elements are failing, your verdict would be not guilty."

[22] "Our appellate courts frequently have stated that a party may not pursue one course of action at trial for tactical reasons and later on appeal argue that the path he rejected should now be open to him." (Internal quotation marks omitted.) *State* v. *Davis*, 76 Conn. App. 653, 662, 820 A.2d 1122 (2003). *Golding* is not intended to give an appellant a second bite at the apple.

## IV

The defendant's fourth claim is that he is entitled to a judgment of acquittal as to his conviction of larceny in the third degree and attempt to commit larceny in the third degree because the state failed to present sufficient evidence that the value of the personalty with respect to each conviction exceeded $1000.[23] Underlying his claim is the defendant's contention that the court abused its discretion by admitting evidence of the value of the personalty taken by the defendant and by improperly instructing the jury in failing to tell it that it must be convinced that the personalty was taken as part of a common scheme before it could aggregate the value of the property. We disagree.

We note first that the defendant was charged in the same information with one count of larceny in the third degree and one count of attempt to commit larceny in the third degree. Both counts alleged that the criminal conduct occurred at 320 Kelsey Street on January, 28, 2000, at approximately noon. Each count identified by name the personalty that was relevant to it. The defendant's claim rests on the presumption that the state failed to prove beyond a reasonable doubt the value of the stolen property and, thus, did not establish an element of the crime. See *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).[24]

### A

We will first consider whether the court improperly admitted evidence of the value of the Fraulinos' person-

[23] At oral argument in this court, the defendant requested permission to file a supplemental brief as to that claim. The court granted permission and ordered both the state and the defendant to file a supplemental brief as to whether it was improper, pursuant to General Statutes § 53a-121, for the trial court not to charge the jury that before it could aggregate the value of the items taken, it must be convinced that there was a common scheme or course of conduct in the taking of the various items.

[24] We apply the standard of review for sufficiency of the evidence claims set out in part I.

alty, which the defendant and his accomplice either stole or attempted to steal.

The following facts are relevant to our consideration of the defendant's claim. Rosemary Fraulino testified at trial that a number of items were missing from her home after it was ransacked by the defendant and his accomplice, specifically two television remote controls, a Nike watch, $300 belonging to her son and four of her husband's rings: his wedding band, high school class ring, college class ring and a pinkie ring. She admitted that she did not know the current value of the items, but testified that she had paid $350 for the wedding band twenty-six years earlier. She also testified that two televisions, a videocassette recorder, a pillowcase containing jewelry, a video camera and a video game system had been moved to the area by the front door. She did not know the current value of any of those items, either. Some of the items themselves and photographs of others were entered into evidence as exhibits for the jury to view.

Outside the presence of the jury, the state proffered Michael Fraulino's testimony as to the value of the items the defendant stole or attempted to steal from him and from members of his family. He testified that the state had advised him to visit local retail establishments to determine the December, 2001 market value of the stolen property. The court overruled the defendant's objection to the proffered testimony on foundation and hearsay grounds. In the jury's presence, Michael Fraulino testified that he had visited stores and priced items comparable to the items that were taken or moved. He testified as to the purchase price of the items in December, 2001, as related to him by various retail clerks.[25] He also testified as to how much he had paid

[25] Michael Fraulino testified as to the value of the personalty found in the defendant's motor vehicle: The purchase price of his high school ring was $200, he could not estimate its value, as he would not sell it, and it could be replaced for $150; the two television remote controls could be replaced

for some of the items and the amount of money for which he would have sold some of them. The defendant presented no evidence to contradict the values as to which Michael Fraulino testified.

The defendant objected to Michael Fraulino's testimony as to the original purchase price of the items, arguing that it was irrelevant given that the property had depreciated in value since it was acquired. He also objected to the price for which Michael Fraulino would sell the property because there was no evidence that anyone would pay that price. He objected to evidence of the current retail cost of the property as hearsay. The court overruled the objections, stating that an owner may approximate the market value of property, but if that value cannot be determined adequately, the replacement value may be entered into evidence. Furthermore, Michael Fraulino's testimony did not reflect his unsubstantiated opinion of the replacement value, but rather of what he had found it would cost to replace the property.

The defendant claims that the court abused its discretion by admitting Michael Fraulino's testimony. We review evidentiary claims under the abuse of discretion standard. See *State* v. *Lugo*, 266 Conn. 674, 700, 835 A.2d 451 (2003).

for $15 each; his pinkie ring could be replaced for $100; his wife had purchased his wedding ring for $300, and he would sell it or replace it for $250; the replacement value of Rosemary Fraulino's gold necklace was $295 and gold bracelet was $150, although he would sell the bracelet for $100; and the replacement cost of his college class ring and his sale price was $250.

As to the Fraulino personalty that the defendant had abandoned by the front door, Michael Fraulino testified that he had purchased the 1990 television for $300 and that a new, comparable model and his selling price was $189; the purchase price of a larger 1989 television and videocassette recorder was $1777, which in 2001 could be purchased for $500 and $250, respectively, and he would have sold them for $750; the Sony video camera belonged to the high school where he taught and in December, 2001, a similar model cost $800; the 1999 purchase price of his son's Sega Dreamcast video game system was $300, and he would sell it for $100.

Section 53a-124 provides in relevant part that a person is guilty of larceny in the third degree when he commits larceny and the value of the property exceeds $1000.[26] The same value of the property pertains to the crime of attempt to commit larceny in the third degree. Our Penal Code defines value of property as "the market value of the property or services at the time and place of the crime or, if such cannot be satisfactorily ascertained, the cost of replacement of the property . . . within a reasonable time after the crime. . . ." General Statutes § 53a-121 (a) (1). "Market value has been defined as the price that would in all probability . . . result from fair negotiations, where the seller is willing to sell and the buyer desires to buy." (Internal quotation marks omitted.) *State* v. *Collette*, 199 Conn. 308, 313, 507 A.2d 99 (1986).

"The law in Connecticut is well settled as to the competency of the owner of property to testify as to its value. . . . [T]he competence of a witness to testify to the value of property may be established by demonstrating that the witness owns the property in question. . . . The rule establishing an owner's competence to testify reflects both the difficulty of producing other witnesses having any knowledge upon which to base an opinion especially where the stolen items are never recovered . . . and the common experience that an owner is familiar with her property and knows what it is worth." (Internal quotation marks omitted.) *State* v. *Davis*, 3 Conn. App. 359, 367, 488 A.2d 837 (1985).

"It is difficult, however, to conceive of an owner having an innate concept of value simply by virtue of ownership. An owner must of necessity rely on other

[26] On appeal, the defendant does not claim that if Michael Fraulino's testimony is believed, the value of the personalty the defendant stole and the value of the personalty he attempted to steal do not each exceed $1000 under any of the three means of valuation the defendant presented in his brief.

sources for his knowledge of value. Thus, [t]he *owner of an article*, whether he is generally familiar with such values or not, ought certainly to be allowed to estimate its worth; the weight of his testimony (which often would be trifling) may be left to the jury; and courts have usually made no objections to this policy." (Emphasis in original; internal quotation marks omitted.) Id. We therefore conclude that the court properly permitted Michael Fraulino to testify as to the replacement value of the Fraulino personalty.

The trier of fact determines the value of property. *State* v. *Nunes*, 58 Conn. App. 296, 303, 752 A.2d 93, cert. denied, 254 Conn. 944, 762 A.2d 906 (2000). A reviewing court "will not disturb the trier's determination if, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Collette*, supra, 199 Conn. 314.

The defendant argues that Michael Fraulino should not have been permitted to testify as to the value of the stolen property because there was no proof that the actual value was not ascertainable. As the defendant notes in his brief, the value of certain property at the time of the crime often is not ascertainable, particularly as in this case where jewelry and electronics equipment were taken. Jewelry, on the one hand, may appreciate in value; *State* v. *Paoletto*, 181 Conn. 172, 182, 434 A.2d 954 (1980); and for sentimental reasons, an owner is unable to value the item because he is unwilling to sell it. On the other hand, electronic equipment is subject to prompt depreciation. See, e.g., *State* v. *Baker*, 182 Conn. 52, 63, 437 A.2d 843 (1980). The purchase price is therefore insufficient to establish value. Id.

Here, the state offered three types of evidence as to the value of the property the defendant stole or

attempted to steal from the Fraulino family: purchase price, replacement value and sale on the open market. A chart in the defendant's brief demonstrates that the value of each set of property, regardless of the formulation exceeded $1000.

The test is whether the evidence was sufficient for the jury reasonably to conclude on the facts established and the reasonable inferences drawn therefrom that the cumulative value of the evidence was sufficient to justify a guilty verdict. We conclude that it was. The jury was free to accept or to reject Michael Fraulino's testimony. Furthermore, the jury was able to view some of the stolen or near stolen items. Each item was a common artifact of modern life. None of them was so unusual that the jury was not able to apply its experience in the affairs of life to accord proper weight to Michael Fraulino's testimony.

B

We now turn to the second underlying part of the defendant's sufficiency of the evidence claim, which is whether it was improper for the court to fail to charge the jury that it "was entitled to aggregate the value of those items *only* if it first concluded that the offenses were committed pursuant to one scheme or course of conduct as required by § 53a-121 (b) . . . ."[27] (Emphasis in original; internal quotation marks omitted.) *State v. Desimone*, 241 Conn. 439, 452, 696 A.2d 1235 (1997). We conclude that the court's charge was not improper, as the jury could not possibly have been misled.

The facts that are relevant to our analysis are the information and the court's instruction to the jury. The defendant was charged in separate counts of the same

[27] General Statutes § 53a-121 (b) provides in relevant part: "Amounts included in thefts committed pursuant to one scheme or course of conduct, whether from the same person or several persons, may be aggregated in determining the grade of the offense."

information with larceny in the third degree and attempt to commit larceny in the third degree. The court stated in the relevant portion of its charge: "The second count on that information is larceny, and it . . . accuses [the defendant] of larceny in the third degree and charges that at the town of Middletown, at 320 Kelsey Street on the twenty-eighth day of January, 2000, at approximately noon, the [defendant and his accomplice] with intent to deprive another of property and to appropriate the same to themselves, did wrongfully take such property, to wit: jewelry, cash and TV remote controls, of a value in excess of $1000 from an owner, namely, Rosemary and Michael Fraulino. . . .

"The third element is that the value of the property is over $1000. The law sets forth the standard you are to use in considering the value of the property or service involved. Here, it's property. Value means the market value of the property at the time and place of the crime. . . . If the state has proven each and every element of this count beyond a reasonable doubt, your verdict would be guilty of larceny in the third degree. If any of the elements are lacking, your verdict would be not guilty."

"The third count is a charge of an attempt to commit larceny in the third degree and charges that at the town of Middletown, at 320 Kelsey Street, January 28, 2000, at approximately noon, the [defendant and his accomplice], with intent to deprive another of property and to appropriate the same to themselves, did attempt to wrongfully take such property, to wit: a television, camcorder, jewelry and electronic equipment of a value in excess of $1000 from an owner, namely, Rosemary and Michael Fraulino."

We have reviewed the transcript of the court's charge. The court did not tell the jury that it may aggregate the value of the property or that if it did aggregate the value

of the property, that it had to find that the defendant stole or attempted to steal the property as part of a common scheme or course of conduct.

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Betances*, supra, 265 Conn. 509–10.

Our Supreme Court has explained the relationship between § 53a-121 (b) and our larceny statutes generally. "Section 53a-119 defines the crime of larceny and sets out a nonexclusive list of ways in which that offense may be committed. One determinant of the grade of the offense of larceny is the value of the property stolen. Under our statutory scheme, the grades of that offense range from first degree larceny, which includes thefts of property exceeding $10,000 in value, to sixth degree larceny, which includes thefts of property valued at $250 or less. . . . In addition, § 53a-121 (a) explains how the value of property is to be ascertained. . . . Finally, § 53a-121 (b) provides that the value of each of the items alleged to have been stolen may be aggregated for purposes of determining the degree of larceny when the thefts were committed pursuant to one scheme or course of conduct." (Citations omitted.) *State* v. *Desimone*, supra, 241 Conn. 453.

The defendant relies on *Desimone*, a case involving possession of stolen property,[28] to support his claim of improper jury instruction. We disagree that *Desimone* supports his position because the facts of that case are wholly distinguishable from the facts here, which, thus, required a different legal conclusion.[29] The concurring opinion in *Desimone*, however, cites the rule applicable to that factual distinction, and that rule applies here. "Where a defendant is not charged simply with the possession of stolen goods, the rule that *separate thefts* cannot be considered together as to the value of stolen property absent a common scheme or course of conduct may apply. Such an instruction is not required where a defendant is charged only with the simultaneous possession of stolen property. *People* v. *Buckley*, 75 N.Y.2d 843, 846, 552 N.E.2d 160, 552 N.Y.S.2d 912 (1990); *People* v. *Loret*, 136 App. Div. 2d 316, 317, 526 N.Y.S.2d 872 (1988)." (Emphasis added.) *State* v. *Desimone*, supra, 241 Conn. 465 (*McDonald, J.*, concurring).[30]

The facts in *Desimone* that are relevant to our analysis are that the defendant was convicted of larceny in the first degree by receiving stolen property and larceny in the fourth degree by receiving stolen property. Id., 440–41. The violations were alleged in two separate informations. Id., 442. The evidence at trial demonstrated that between January, 1993, and January, 1994, Pfizer, Inc., where the defendant was an employee,

[28] Receiving stolen property is a violation of General Statutes § 53a-119 (8).

[29] Our Supreme Court held that "the jury should not have been instructed to aggregate the value of the various items of property identified in each of the informations absent its determination that each alleged offense was committed pursuant to one scheme or course of conduct." (Internal quotation marks omitted.) *State* v. *Desimone*, supra, 241 Conn. 458.

[30] The majority acknowledged the existence of the different legal rule. *State* v. *Desimone*, supra, 241 Conn. 457; but see *People* v. *Buckley*, 75 N.Y.2d 843, 846, 552 N.E.2d 160, 552 N.Y.S.2d 912 (1990) (simultaneous possession of stolen property belonging to different persons can be considered one offense and value of property aggregated).

reported missing various items of personalty, including laptop computers. Id., 443. Police recovered the property at issue in the defendant's possession on separate dates and under different circumstances. Id., 443–48. When charging the jury, the court stated that the jury could add together the values of the computers and aggregate the values of the property in each information. Id., 450 n.20. The court did not instruct the jury that it could aggregate the values of the property only if it found that the defendant had committed the alleged offense pursuant to one scheme or course of conduct.

Here, the defendant was charged in one information with larceny in the third degree and attempt to commit larceny in the third degree. Each charge was alleged to have occurred at a discrete time and place. There were no separate incidents, as in *Desimone.* Indeed, with respect to his double jeopardy claim as to larceny and attempt to commit larceny; see part III C; the defendant argued that his activity with respect to the Fraulino personalty constituted a continuing course of conduct. We concluded that the evidence supported separate charges of larceny and attempt to commit larceny. The counts of the information also delineated the property at issue for each offense.

The New York case law on possession of stolen property on which our Supreme Court relied in part in *Desimone* concerned a series of thefts from subway token boxes. See *People* v. *Cox,* 286 N.Y. 137, 139, 36 N.E.2d 84 (1941). The rule pertaining to the facts of that case is that "where property is stolen from the same owner and from the same place *in a series of acts,* those acts constitute a single larceny regardless of the time elapsing between them, if the successive takings be pursuant to a single intent and design and in execution of a common fraudulent scheme." (Emphasis added.) Id., 141. By contrast, "*simultaneous possession* of stolen property . . . can be considered one offense and

the value of the property aggregated . . . ." (Emphasis added.) *People* v. *Buckley*, supra, 75 N.Y.2d 846.[31]

The defendant was not charged with having committed a series of thefts. He simultaneously stole and simultaneously attempted to steal two distinct sets of personalty belonging to the Fraulino family. The court's instruction made that perfectly clear. There was evidence before the jury by which it could have found that at the time, date and place alleged, the defendant stole or attempted to steal the property itemized in each count and in the court's charge and that the value of the property exceeded $1000. We therefore conclude that the court did not improperly instruct the jury.

Consequently, for the reasons stated, the defendant was not convicted of larceny in the third degree and attempt to commit larceny in the third degree by means of insufficient evidence and, therefore, is not entitled to a judgment of acquittal.

We have considered each of the defendant's unpreserved claims for which he sought *Golding* review and have concluded that none of them constitute one of those exceptional circumstances in which a constitu-

[31] Our Supreme Court also construed General Statutes § 53a-121 and the Model Penal Code to reach its conclusion that "provisions relating to the grading of theft offenses, which include language that is in all material respects identical to § 53a-121 (b), are deemed to be applicable to 'all forms of the theft offense' as that offense is defined in the Model Penal Code." *State* v. *Desimone*, supra, 241 Conn. 457. That construction relates to the grading of the offenses, not to temporality.

We are mindful of the tenets of statutory construction. "In construing a statute, common sense must be used, and the courts will assume that the legislature intended to accomplish a reasonable and rational result. . . . A statute . . . should not be interpreted to thwart its purpose." (Citation omitted; internal quotation marks omitted.) *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 126–27, 584 A.2d 1172 (1991). Here there was but one theft and one attempted theft occurring at the same time and place. A fortiori, the crimes committed in this case were committed pursuant to a common course of conduct.

tional violation clearly exists that clearly deprived him of a fair trial. See *State* v. *Golding,* supra, 213 Conn. 239–40.

The judgment is affirmed.

In this opinion the other judges concurred.