******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BRYANT BROWNE *v.* COMMISSIONER
OF CORRECTION
(AC 36190)

Lavine, Beach and Mullins, Js.

*Argued March 2—officially released June 16, 2015*

(Appeal from Superior Court, judicial district of Tolland, Newson, J.)

*Naomi T. Fetterman*, for the appellant (petitioner).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Peter A. McShane*, state's attorney, and *Yamini Menon*, assistant state's attorney, for the appellee (respondent).

*Opinion*

BEACH, J. The petitioner, Bryant Browne, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. The petitioner claims that the court erred in concluding that he failed to prove that (1) trial counsel rendered ineffective assistance for not retaining expert witnesses as to various issues at trial, (2) trial counsel rendered ineffective assistance at sentencing, and (3) appellate counsel rendered ineffective assistance for failing to raise a certain claim on appeal. We affirm the judgment of the habeas court.

The following facts were set forth by this court in *State* v. *Browne*, 84 Conn. App. 351, 854 A.2d 13, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004): "On January 28, 2000, the [petitioner] was an unemployed drug addict with a $40 a day heroin habit. That morning, he met his accomplice, Victor Santiago, in New Haven and drove to Middletown. At approximately 11:30 a.m., the pair forcibly entered the unoccupied home of the Fraulino family. They ransacked the house, collecting jewelry, cash and electronic equipment. Shortly thereafter, Rosemary Fraulino returned home and observed an unfamiliar motor vehicle in the driveway. She did not stop at her house but instead called the police on her cellular telephone to alert them to the suspicious occurrence.

"John Labbadia, a Middletown police officer, responded to the scene and partially blocked the [petitioner's] vehicle in the driveway. The [petitioner] and Santiago saw Labbadia arrive. When the officer walked to the rear of the house, they abandoned some of the Fraulinos' possessions in the living room and foyer. The [petitioner] got into his vehicle and sped away with his accomplice.

"Labbadia, believing that he had interrupted a burglary, radioed the police dispatcher. He pursued the [petitioner] and Santiago on back roads and side streets to Route 9. George Dingwall, a sergeant on the Middletown police force, heard Labbadia's broadcast and joined the pursuit. A Portland police officer also heard Labbadia's broadcast. Three police cruisers with lights and sirens activated followed the [petitioner's] vehicle south on Route 9 at a high rate of speed.

"The state police had been alerted, and a number of troopers positioned themselves at exit six on Route 9. One trooper placed stop sticks across a lane of the highway, but the [petitioner] successfully avoided them. Several troopers then joined the chase. The [petitioner] operated his vehicle in an erratic manner back and forth across the highway.

"Near exit four in Essex, Dingwall drove his cruiser beside the [petitioner's] vehicle. The [petitioner] swerved his vehicle toward Dingwall's vehicle. Dingwall

lost control of his cruiser, which spun around and off the highway, crashing in a heavily wooded portion of the median.

"The [petitioner] continued to drive south on Route 9 at a high rate of speed. Scott Wisner, a state trooper, positioned his cruiser alongside the [petitioner's] vehicle. The [petitioner] swerved toward Wisner's cruiser, striking it. Wisner dropped back, and Labbadia moved his cruiser ahead of the [petitioner's] vehicle. The [petitioner's] car struck the rear of Labbadia's cruiser, which also spun out of control and off the highway. The [petitioner] then drove onto Interstate 95 southbound.

"The state police responded in force. One trooper preceded the pursuit and warned motorists to move off the highway. State troopers used their cruisers to block the entrance ramps to the interstate highway. At exit sixty-seven, the state troopers deployed stop sticks again, but the [petitioner] veered off the roadway to avoid them. At exit sixty-three in Clinton, police cruisers were parked in the gore between the exit and entrance ramps to the highway. State troopers were standing in the gore in another effort to deploy stop sticks. The [petitioner] saw the trap and drove off the highway through the gore, coming dangerously close to the troopers standing there. He drove onto the entrance ramp and back onto the highway.

"The [petitioner] continued to weave through traffic. Between exits fifty-nine and fifty-eight in Guilford, Adam Brown, a state trooper, successfully deployed stop sticks under the tires of the [petitioner's] vehicle. Nevertheless, the [petitioner] kept going and at exit fifty-seven attempted to force Robert Hart, a state trooper, off the highway. The [petitioner] stopped his vehicle, which was traveling on the rims of its wheels, against the Jersey barriers near exit fifty-four in Branford.

"When the [petitioner] got out of his vehicle, he said, 'I'm on drugs, man—real bad—I'm on drugs.' Personalty belonging to the Fraulino family was found in the [petitioner's] vehicle. As a state trooper was transporting the [petitioner] to the state police barracks in Westbrook, a police radio dispatch broadcasted information that Dingwall had been transported to a hospital by Life Star helicopter. In response, the [petitioner] made several unsolicited remarks: 'It's not my fault; I'm on drugs; you can't blame me for any of this because I'm on drugs.' Dingwall died as a result of his injuries." (Footnotes omitted.) Id., 355–58.

"The [petitioner] was charged in five informations with numerous criminal and motor vehicle violations, which were consolidated for trial. The jury found him guilty of larceny in the third degree in violation of General Statutes §§ 53a-124 (a) (2) and 53a-119, attempt to commit larceny in the third degree in violation of Gen-

eral Statutes §§ 53a-49 (a), 53a-124 (a) (2) and 53a-119, conspiracy to commit burglary in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-103, conspiracy to commit larceny in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-124, disregarding an officer's signal by engaging an officer in a pursuit resulting in death in violation of General Statutes § 14-223 (b), interfering with an officer in violation of General Statutes § 53a-167a (a), attempt to commit assault of a peace officer in violation of General Statutes §§ 53a-49 (a) (2) and 53a-167c (a) (1), criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1), misconduct with a motor vehicle in violation of General Statutes § 53a-57, reckless driving in violation of General Statutes § 14-222 and engaging an officer in pursuit in violation of General Statutes § 14-223 (b). The [petitioner's] total effective sentence was thirty-two years in the custody of the commissioner of correction." Id., 354 n.1. "The jury found the [petitioner] not guilty of burglary in the first degree, conspiracy to commit burglary in the first degree, felony murder, manslaughter in the first degree, criminal mischief in the first degree and two counts of attempt to commit assault in the first degree. The jury was unable to reach a verdict on the charges of attempt to commit assault of a peace officer and reckless endangerment in the first degree, and the court declared a mistrial as to those counts." Id., 355 n.2. Santiago was tried separately. Id., 356 n.3. The petitioner's judgment of conviction was affirmed on direct appeal. Id., 395.

In his third amended petition for a writ of habeas corpus, the petitioner alleged (1) ineffective assistance of his trial counsel, Norman A. Pattis, in failing to retain an expert witness to appraise or to contest the valuation of the allegedly stolen items; in failing to employ an expert witness to challenge the state's theories of causation and intent as to the death of Dingwall; in failing to retain an expert to contest the state's theory regarding contact between the petitioner's vehicle and Wisner's police cruiser; and in failing to prepare adequately for the petitioner's sentencing, and (2) ineffective assistance of his appellate counsel, Mark Rademacher, for failing to raise a certain claim on appeal. The habeas court denied his petition. The court granted the petition for certification to appeal. The petitioner filed a motion for articulation, requesting the court to address the ground that trial counsel was ineffective at sentencing. The court granted the motion and issued an articulation denying that claim. This appeal followed.

We begin with our standard of review for claims of ineffective assistance of counsel. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary.

. . . As enunciated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] . . . [a] claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong . . . .

"Additionally, a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citations omitted; internal quotation marks omitted.) *Roberts* v. *Commissioner of Correction*, 155 Conn. App. 360, 362–64, 109 A.3d 956, cert. denied, 316 Conn. 902, 111 A.3d 470 (2015).

I

The petitioner claims on appeal that the court erred in concluding that he had failed to prove ineffective assistance of trial counsel for failing to retain an expert (1) to appraise or to contest the valuation of the stolen items, and (2) to challenge the state's theories of causation and intent as to the death of Dingwall, and to contest the state's theory regarding contact between the petitioner's vehicle and Wisner's police cruiser. We are not persuaded.

A

The petitioner claims that the court erred in rejecting his claim that trial counsel provided ineffective assistance by not retaining an expert witness to contest the state's evidence at trial as to the value of the items that the petitioner stole or attempted to steal from the Fraulino residence. We are not persuaded.

The petitioner was convicted of larceny in the third degree and attempt to commit larceny in the third degree. For the jury to have found the petitioner guilty

of both charges under § 53a-124 (a) (2), it would have had to find that the value of the property exceeded $1000 for each respective count. General Statutes § 53a-121 (a) (1) provides in relevant part that "value means the market value of the property . . . at the time and place of the crime or, if such cannot be satisfactorily ascertained, the cost of replacement of the property or services within a reasonable time after the crime."

At the petitioner's criminal trial, Rosemary Fraulino testified as to items that were stolen or attempted to be stolen, including jewelry and electronics items; she did not know the value of the items. *State* v. *Browne*, supra, 84 Conn. App. 385. Outside the presence of the jury, the state proffered the testimony of Michael Fraulino as to the value of items that the petitioner stole or attempted to steal from the home. He stated that he had visited various retail establishments in an effort to determine the market value of the items. Id. The petitioner's trial counsel objected on grounds of hearsay and lack of foundation; the court overruled the objection. Id. In the jury's presence, Michael Fraulino testified as to the purchase price, replacement value and value of the items if sold on the open market. Id., 389. The value of the property, regardless of the formulation, exceeded $1000. Id.

At the habeas trial, the petitioner presented the expert testimony of a jewelry appraiser who testified that many of the gold jewelry items were personalized and thus needed to be melted down in order to be sold, and that the total value of the jewelry items was $326. The petitioner also presented information from an insurance adjuster who calculated the fair market value of the electronic items, using a straight line depreciation of 10 percent per year for each item. He valued the items at: $116 for the Sony nineteen inch television, $199 to $233 for the Zenith twenty-seven inch television, $113 for the Zenith VCR, and $159 for the Sega Dreamcast. He was unable to place a value on the Sony camcorder because he did not know its year and model.

Pattis testified at the habeas trial that he did not consult an expert regarding the valuation of the items taken from the Fraulino home. He testified that he "had no strategic reason. It was an oversight." He testified that "[m]y eye was on the death counts," and "all my time was trying to avoid the manslaughter and felony murder convictions. There was little doubt in my mind that [the petitioner] was present in the home and that there [were] some crimes committed. I just was trying to save what I could of his life." He further testified that he was successful in getting the petitioner acquitted of the more serious charges. Regarding the testimony of Michael Fraulino as to valuation, Pattis testified that "[i]t was difficult for me to believe that the jury was going to find him credible on that point. . . . [W]e spent a lot of time investigating [Michael Fraulino], and

I knew a fair amount about him. I didn't expect him to testify as an expert on valuation." Pattis testified that at the criminal trial, he cross-examined Michael Fraulino regarding his estimates and stated at the habeas trial that his "estimates were unreliable . . . I didn't think it should be admitted and it should be accorded no weight, but as I said earlier, it didn't occur to me to get a countervailing expert, and I didn't, even after I heard the testimony."

The habeas court found that "it was clear from reviewing the transcript that [Pattis] believed that the state's failure to have their own expert was a fatal mistake, and he was adequately prepared to make the challenge when the state attempted to introduce the evidence through [Michael] Fraulino. It is clear from the record that the strategy, rather than putting on affirmative evidence of value, was to prevent any evidence of value from coming before the jury, which would have been fatal to the larceny and attempted larceny in the third degree charges if he had succeeded." The court further stated that Pattis objected to the admission of Michael Fraulino's testimony as to value and subjected him to "vigorous cross-examination, bringing to light for the jury, if they chose to accept it . . . that [Michael] Fraulino's sentimental attachment to the property resulted in inflated values. Attorney Pattis also succeeded in getting [Michael] Fraulino to admit that he had no idea what the various pieces of property would have been worth in or around January 28, 2000. This is the classic 'hindsight is 20/20' argument being made by the petitioner. Attorney Pattis had what appears to have been a more than reasonable strategy to prevent the state from presenting any evidence at all on an essential element of the larceny third related charges. In hindsight, however, that strategy was not successful. An unsuccessful trial strategy, however, is not per se one [and] the same with constitutionally deficient representation. . . . In the present case, the court finds that Attorney Pattis' strategy, although ultimately unsuccessful, was not unreasonable, nor did his approach lack the reasonable level of competence and preparation that one would expect from a criminal defense attorney under similar circumstances." (Citations omitted.)

The petitioner claims that the court erred in concluding that Pattis did not perform deficiently by failing to retain an expert to present an independent valuation of the items or to contest the value given to the items by Michael Fraulino. He argues that expert evidence was presented at the habeas trial that revealed that the values of the items stolen and attempted to be stolen were both less than $1000 and, thus, insufficient to sustain the conviction of the charges of larceny and attempt to commit larceny.[1] We are not persuaded.

Expert testimony as to value is not required to sustain

a conviction for larceny. On direct appeal, this court concluded that an owner of property is competent to testify as to the value of the property he owns and that "[t]he rule establishing an owner's competence to testify reflects both the difficulty of producing other witnesses having any knowledge upon which to base an opinion especially where the stolen items are never recovered . . . and the common experience that an owner is familiar with her property and knows what it is worth. . . . It is difficult, however, to conceive of an owner having an innate concept of value simply by virtue of ownership. An owner must of necessity rely on other sources for his knowledge of value. Thus, [t]he owner of an article, whether he is generally familiar with such values or not, ought certainly to be allowed to estimate its worth; the weight of his testimony (which often would be trifling) may be left to the jury; and courts have usually made no objections to this policy." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Browne*, supra, 84 Conn. App. 387–88; see also *State* v. *Adams*, 14 Conn. App. 119, 125–26, 539 A.2d 1022 (1988) (owner's testimony as to value of car sufficient to establish market value at time of crime to support conviction of larceny in fourth degree).

Pattis' not presenting expert testimony to contradict Michael Fraulino's testimony did not constitute deficient performance. Although Pattis testified that, in hindsight, he would have retained an expert to testify as to valuation, he also testified that his strategy was to focus on the more serious murder charges and to cross-examine Michael Fraulino vigorously as to valuation regarding the larceny charges. The habeas court found this to be reasonable trial strategy.

The concentration on cross-examination and, of course, trying to preclude allowing Michael Fraulino's opinions into evidence, constituted reasonable strategy and may well have turned out to have been superior to calling experts to testify. Although there was nothing necessarily inconsistent in trying to keep out or entirely discredit Michael Fraulino's evidence and also calling an expert, the potentially negative aspect of calling an expert ought not be overlooked. The experts who testified at the habeas trial on behalf of the petitioner assigned significant value to the property. Though less than $1000 with respect to each charge,[2] the values assigned by the experts, if believed, were sufficient to support a conviction of slightly lesser degrees of larceny, but a floor would have been established. Much of the value of successful cross-examination of Michael Fraulino would have been lost. Further, cross-examination of experts at trial may have yielded benefits for the state's case. Decisions as to what witnesses to call at trial sometimes resemble a chess game: each move seeking an advantage may have the potential to create or to expose a weakness.

Pattis' not calling an expert as to value, even if the option was not considered by him at the time, did not render his performance defective. Pattis' actions in this regard clearly fell "into the category of trial strategy or judgment calls that we consistently have declined to second guess." (Internal quotation marks omitted.) *Crocker* v. *Commissioner of Correction*, 126 Conn. App. 110, 132, 10 A.3d 1079, cert. denied, 300 Conn. 919, 14 A.3d 333 (2011).

B

The petitioner next claims that the court erred in concluding that Pattis did not render deficient performance by not retaining an expert witness to testify and to challenge the state's theory of causation as to the death of Dingwall and the collision between Wisner's cruiser and the petitioner's vehicle, which resulted in Wisner's vehicle being forced off the road. We disagree.

As to Dingwall's death, the jury reasonably could have found the following facts. Labbadia and Dingwall attempted to box in the petitioner's vehicle; Labbadia positioned his cruiser in front of the petitioner's vehicle and slowed down. *State* v. *Browne*, supra, 84 Conn. App. 359. Dingwall drove his cruiser alongside the petitioner's vehicle and the petitioner swerved into the travel lane occupied by Dingwall's cruiser. Id. Dingwall avoided a collision, but lost control of his cruiser, which spun counterclockwise off the highway and collided with trees on the median strip. Id. An accident reconstruction expert for the state police, Jae Fontanella, discovered that Dingwall's cruiser was equipped with three Goodyear all season tires and one snow tire. Id. At the accident scene, Fontanella viewed tire marks that indicated that the cruiser had been oversteered to the left, causing the vehicle to move counterclockwise. Id. Darryl Fieldman, a Goodyear product-analyst engineer, prepared a report stating that it was important for a police cruiser operating at high speeds to be equipped with four of the same type of tires. Id. At the criminal trial, Fontanella and Fieldman could not determine the cause of the accident. Id., 360. Fieldman noted that it was possible but improbable that the mismatched tires on Dingwall's cruiser caused the cruiser to spin off the road. Id. The petitioner's theory at the criminal trial, however, was that the fatal accident was substantially caused by mismatched tires on Dingwall's police cruiser. Id., 365. The jury apparently did not agree with the petitioner's theory. The jury found the petitioner guilty of the crimes of misconduct with a motor vehicle and disregarding an officer's signal by engaging an officer in pursuit, causing death.

At the habeas trial, the petitioner presented the following expert testimony regarding the cause of Dingwall's death. James H. Gifford, an expert in the forensic analysis of tires, testified that Dingwall's police cruiser

had mismatched tires, as there were three all season tires and, on the right rear wheel, a winter tire. The differences between the tire designs caused the vehicle to oversteer to the left, resulting in Dingwall's loss of control of the vehicle during the high speed pursuit. On cross-examination, Gifford conceded that "[i]f [Dingwall] didn't have to make those evasive maneuvers, he wouldn't have lost control." The petitioner also presented the testimony of Dr. Christopher Shapley, an expert in vehicle dynamics. Shapley opined that the loss of control of Dingwall's vehicle was due to "maximum power coupled with some maneuvering. I believe that it was the use of excessive power [and] speed that triggered that loss of control, and this was due to the initiation."

As to the collision with Wisner's vehicle, the state's theory at the criminal trial was that the petitioner drove his vehicle close to Wisner's cruiser in an attempt to force Wisner off the road. The petitioner's theory was that, using boxing maneuvers, Wisner drove his vehicle close to the petitioner's vehicle, thereby causing the collision. The jury apparently disagreed with the petitioner's theory. With respect to the collision of the petitioner's vehicle with Wisner's cruiser, the jury found the petitioner guilty of attempt to commit assault on a peace officer and first degree criminal mischief.

Shapley testified at the habeas trial that the contact between the petitioner's vehicle and Wisner's cruiser was caused by Wisner's attempt to pass the petitioner, which put Wisner's cruiser at risk of being in contact with the petitioner's vehicle. Shapley testified that "[b]ut for the attempt to pass at that point, there would have been no contact."

At the habeas trial, Pattis testified that he did not retain experts to testify as to the issues of causation and intent regarding Dingwall's death, and the collision between the petitioner's car and Wisner's cruiser because "[i]t struck me that I had enough to work with in the state's file, that I didn't have to prove what caused the accident. I just had to shed doubt. I had to put room between [the petitioner's] actions and what caused the accident, and I thought I could accomplish that through the state's experts." He testified that his strategy was to impeach the state's witnesses.

With respect to both incidents involving Dingwall and Wisner, the court found that Pattis provided effective and competent representation. He was prepared to cross-examine every state's witness in great detail, he challenged even slight differences between their trial testimony and prior statements, and "succeeded in getting nearly every important fact witness placed on the [witness] stand by the state to admit that they had modified their trial testimony to be more favorable to the state than some prior statement or testimony the witness had given. The detail with which Attorney Pattis

cross-examined the state's expert witnesses, using scientific terms and terms of art in their respective fields to thoroughly question them about their findings, also made it quite clear that he had gone through pains to educate himself on their reports and the subjects about which they were going to testify, and it was evident that he was properly prepared to challenge them on cross-examination. . . . In all, this court finds that there is no question that Attorney Pattis represented the petitioner in this matter with all the competence and vigor one would expect of a reasonably trained and educated defense attorney."

The habeas court properly concluded that Pattis did not render deficient performance by not offering expert testimony as to the cause of Dingwall's loss of control of his vehicle or as to the cause of the collision with Wisner's vehicle. Pattis' trial strategy was to cross-examine the state's witnesses vigorously and effectively rather than to call additional experts. On cross-examination at the habeas trial, the petitioner's experts conceded points that could have helped the state's case. A strategy of making points by cross-examination of his opponent's witnesses may well have been more effective than presenting testimony through his own witnesses, who, at the habeas trial, agreed with some of the state's contentions.

## II

The petitioner next claims that the court erred in rejecting his claim that Pattis was ineffective at sentencing because of inadequate preparation. We disagree.

In his third amended petition, the petitioner claimed that Pattis failed to investigate adequately and to present mitigation evidence. The petitioner claims on appeal that at sentencing, Pattis presented no evidence of the petitioner's ability to rehabilitate and, as a result, the court imposed a thirty-two year sentence on the petitioner, who was thirty-six years old at the time of the crimes.

"Sentencing by its nature is a discretionary decision that requires the trial court to weigh various factors and to strike a fair accommodation between a defendant's need for rehabilitation or corrective treatment, and society's interest in safety and deterrence." (Internal quotation marks omitted.) *State* v. *Wade*, 297 Conn. 262, 284, 998 A.2d 1114 (2010).

At sentencing, Dingwall's widow testified emotionally about Dingwall's death, and the prosecutor stressed that police officers make ultimate sacrifices to protect citizens. Pattis stressed that the petitioner was not convicted of murder, was not a "cop killer" and that all persons are "equal and redeemable . . . ." Eric Browne III, the petitioner's brother, spoke on the petitioner's behalf. He explained that "[w]e all think because we live in the suburbs that . . . it doesn't

affect us, these things from the city. These drugs are everywhere." He stated that the petitioner had been involved with drugs and had been addicted for eighteen years, but that "he's a beautiful person outside of the drugs . . . [and] we just hope that . . . my brother's given another chance because . . . I do still believe he can be a good member of society, a productive member." Joan Browne-Perkins, the petitioner's aunt, described the petitioner's "winning smile with the personality to match and the naturally inquisitive mind." She explained that the petitioner was always "taking something apart and trying to figure out how it worked," but that one day he became involved in the "culture of drugs," that his addiction changed his life and that his addiction, like any other disease, needs to be treated. She explained that the petitioner had been involved in treatment for his addiction and that he had "never maliciously, deliberately or purposefully hurt anyone." The petitioner's father, Eric Browne, Jr., stated that the petitioner's addiction "has taken a toll on all of us." The petitioner expressed regret for his actions on the day at issue, and explained that he had struggled with recovery, that he was under the influence on the night of the crimes and that he had not wanted to hurt anyone.

The sentencing court stated that the case was "a tough case for this jury." The court stated that the petitioner's family seemed like a "very good family," and that the petitioner had a supportive and "excellent upbringing . . . ." The court stated that "[t]he ends of sentencing are rehabilitation, deterrence, punishment, and in this particular case I'm really not as concerned with rehabilitation. . . . I think the main purpose of this sentencing is punishment." The court noted that the petitioner was not a productive member of society but rather a "career criminal" with a long record of burglaries rooted in a drug habit. He had been involved previously in high speed chases.

At the habeas trial, the petitioner presented the following testimony regarding sentencing. Eric Browne III testified that the petitioner was a good and compassionate person who did "a lot of things for a lot of people," and that on the day in question, the "person that was out there that day wasn't really [the petitioner]. [He] . . . under normal circumstances wasn't the type of person, that was just him that day." He further testified that he had discussed certain things with Pattis prior to testifying, but that there was "really no preparation" for the sentencing hearing. The petitioner's father testified that there was no real preparation for the sentencing hearing. He further testified that the petitioner was "somewhat of a MacGyver genius" who could repair things that did not appear repairable. He explained that "[w]hat I do know is the boy has a good heart. He's made some bad choices. Had he made other choices, he might not be where he is today." The petitioner's girlfriend, who did not speak at sentencing, explained

the circumstances of her meeting the petitioner and that the petitioner had a good heart. The petitioner's mother, who also did not speak at sentencing, explained what a good person the petitioner was and explained that he took a "wrong path."

In its articulation, the court concluded that the petitioner had not proven his claim of ineffective assistance at sentencing because the petitioner was not prejudiced. The court explained that the evidence presented at the habeas trial consisted of testimony from the petitioner's relatives about his being a good person before he became involved with drugs. The court concluded that much of the testimony at the habeas trial regarding sentencing was merely cumulative and that its substance reasonably could have been gleaned by the sentencing court from the remarks that were offered at sentencing. The habeas court stated that "even that small amount of evidence presented at the habeas trial that could be considered new was not so compelling that it would support a finding that there was a reasonable probability that the petitioner would have received a more favorable sentence if the information had been presented to the sentencing judge. . . . As such, the petitioner's claim fails because he has failed to establish that he suffered any prejudice." (Citation omitted.)

The habeas court properly concluded that the petitioner failed to demonstrate prejudice. The court correctly noted that the testimony at the habeas trial regarding sentencing was predominantly cumulative of the statements actually made at sentencing and that the additional statements were not likely, if offered, to have made a difference in the sentencing. Contrary to the petitioner's claim on appeal, the sentencing court did hear the petitioner's relatives discuss his good heart and good qualities. The sentencing court, however, did not find these factors to be especially persuasive. The sentencing court determined that in light of the petitioner's history of chronic drug abuse, his not being a productive member of society, his failure to turn his life around despite many chances at rehabilitation, and his long criminal record, he was beyond rehabilitation and that the purpose of his sentence was punishment.

### III

The petitioner last claims that the habeas court erred in concluding that he had not proven his claim that his appellate counsel, Attorney Mark Rademacher, was ineffective for failing to raise an issue on direct appeal. We disagree.

"To succeed on an ineffective assistance of appellate counsel claim, the petitioner must satisfy both the performance prong and the prejudice prong of *Strickland*." *Haywood* v. *Commissioner of Correction*, 153 Conn. App. 651, 662, 105 A.3d 238, cert. denied, 315 Conn. 908, 105 A.3d 235 (2014). To prevail on the performance

prong, the petitioner must "establish that appellate counsel's representation fell below an objective standard of reasonableness considering all of the circumstances. . . . While an appellate advocate must provide effective assistance, he is not under an obligation to raise every conceivable issue. A brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions. . . . Indeed, [e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on the central issue if possible, or at most on a few key issues." (Internal quotation marks omitted.) *DaEria* v. *Commissioner of Correction*, 107 Conn. App. 539, 542, 946 A.2d 249, cert. denied, 289 Conn. 911, 957 A.2d 877 (2008).

Prior to the criminal trial, the state filed a motion in limine seeking to preclude the petitioner from entering into evidence documents pertaining to the pursuit policies of the Middletown Police Department and an alleged prior pursuit by Dingwall that resulted in a reprimand. After a hearing and an in camera review of the documents, the trial court granted the motion as to the reprimand and denied it as to the pursuit policies. In his third amended petition, the petitioner claimed that Rademacher was ineffective for failing to raise on direct appeal a claim that the trial court erroneously granted, over defense counsel's objection, a motion in limine by the state to preclude the petitioner from offering evidence or inquiring into a prior pursuit by Dingwall. At the habeas trial, the petitioner introduced a document indicating that Dingwall had been issued a verbal warning for violating the department's high speed pursuit policy. Pattis testified at the habeas trial that he had tried to question causation, with respect to Dingwall's death, and to show that Dingwall had a history of reckless pursuits, and that, coupled with the mismatched tires on Dingwall's car, an uncoordinated pursuit was a "recipe for disaster." Rademacher testified that he included in his appellate brief the issues he thought were the strongest and the ones that "had the greatest potential for knocking out those convictions for which [the petitioner] got the most time." He explained that the motion in limine at issue related to causation of Dingwall's death, which "was raised more generally in the first and second issues of my brief,[3] and that this got down to raising it as an evidentiary matter, you know, evidentiary areas [are] not, to me, as important as the constitutional issues that were raised in issues one and two." (Footnote added.)

The habeas court concluded that the petitioner had not proven that Rademacher had rendered deficient performance during the petitioner's direct appeal. The court credited the testimony of Rademacher that he considered the issues, raised those that he thought would provide the petitioner with the best chance of

succeeding on direct appeal, and emphasized claims regarding the charges for which the petitioner had received the longest sentences. The court further noted that the petitioner did not present evidence that called into question Rademacher's knowledge of the law or the reasonableness of his decisions.

We agree with the habeas court's analysis of this claim. "Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one [issue . . . and multiplying] assignments of error will dilute and weaken a good case and will not save a bad one. . . . Most cases present only one, two, or three significant questions. . . . The effect of adding weak arguments will be to dilute the force of the stronger ones." (Internal quotation marks omitted.) *Ormsby* v. *Frankel*, 54 Conn. App. 98, 113 n.6, 734 A.2d 575 (1999), aff'd, 255 Conn. 670, 768 A.2d 441 (2001). Four issues were raised on direct appeal, with two claims having subarguments. See *State* v. *Browne*, supra, 84 Conn. App. 351. In Rademacher's judgment, raising an additional argument, particularly an evidentiary one that repeated the concept of causation already brought to light in the first two claims, was not sound strategy. Rademacher's decision not to pursue this issue on direct appeal fell within "the wide range of reasonable professional assistance"; *Strickland* v. *Washington*, supra, 466 U.S. 689; and did not constitute deficient performance.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The petitioner also argues that it was improper for Michael Fraulino to testify as to replacement cost because under § 53a-121, market value is the primary method of establishing value, and replacement cost can be used only if market value cannot be satisfactorily ascertained, and the testimony as to value set forth at the habeas trial by the petitioner's experts demonstrated that market value could be satisfactorily ascertained.

On direct appeal, this court rejected the petitioner's argument that Michael Fraulino should not have been permitted to testify as to the value of the stolen property. *State* v. *Browne*, supra, 84 Conn. App. 384–89.

[2] The petitioner was charged with larceny as to the items he actually stole, and attempted larceny as to the items he left in the vicinity of the doorway as he left the house in a hurry. *State* v. *Browne*, supra, 84 Conn. App. 377–78.

[3] Rademacher raised a claim of evidentiary insufficiency regarding the crimes of which the petitioner was convicted relating to Dingwall's death and a claim of instructional error relating to the causation of Dingwall's accident. *State* v. *Browne*, supra, 84 Conn. App. 358–67.